Filed 9/6/13  P. v. Ambriz CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B238305 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA376570) |
| v. | |
| FERNANDO AMBRIZ et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed in part, reversed in part and remanded with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant, Fernando Ambriz.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant, Freddy Ambriz.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellants Fernando Ambriz and Freddy Ambriz appeal from judgments of conviction for first degree murder.[1] They contend (1) the trial court erred in declining to hold a hearing to examine alleged juror misconduct, (2) the court erred in denying a mistrial motion brought after a prosecution witness mentioned he had previously arrested Fernando, (3) there was instructional error with respect to Freddy's role as an aider and abettor, and (4) the 10-year gang enhancement must be stricken. The People concede there was sentencing error. We affirm the convictions, and remand for resentencing in light of this opinion.

## STATEMENT OF THE CASE

A jury found appellants guilty of the crime of first degree murder of Shaquana Watson (Pen. Code, § 187, subd. (a)).[2] It found true the special allegation that the crime was committed for the benefit of a criminal street gang, within the meaning of section 186.22, subdivision (b)(1)(C). As to Fernando, the jury found that he personally discharged a firearm within the meaning of section 12022.53, subdivision (d). As to Freddy, the jury found true the allegation that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (d) and (e)(1).

After Fernando admitted he had suffered a prior serious felony conviction for which he served a prison term, the trial court sentenced him to state prison for 81 years to life, consisting of 25 years to life, doubled for the prior strike for the murder, plus a 25-year firearm use enhancement pursuant to section 12022.53,

---

[1] To avoid confusion, when we refer to appellants individually, we will use their first names.

[2] All further statutory citations are to the Penal Code.

2

subdivision (d), plus six years for the prior conviction and prison term. A section 186.22, subdivision (b)(1)(C) 10-year enhancement was imposed and stayed.

Freddy admitted he had suffered three prior serious or violent felony convictions and prison terms. He was sentenced to 82 years to life, consisting of 25 years to life, doubled, for the murder, plus a 25-year firearm use enhancement pursuant to section 12022.53, subdivisions (d) and (e)(1), plus seven years for the prior convictions and prison terms. A section 186.22, subdivision (b)(1)(C) 10-year enhancement was imposed and stayed.

Appellants timely appealed.

### STATEMENT OF THE FACTS

Berneal Holman testified that on July 27, 2010, he had gone to a liquor store at 54th Street and Broadway with his stepbrother, Gregory Draper, and his cousin, Shaquana Watson. Holman was driving a black Lexus. Draper was in the front passenger seat, and Watson was in the back, on the driver's side. After leaving the store and heading north on Broadway, Holman saw a person he knew as "Two," from the Broadway Gangster Crips (Broadway) gang. Holman pulled over to speak with him. As he did so, he saw Two duck. Holman turned to see a white van pull up, and Fernando start shooting at his car. Holman identified Fernando in court as the shooter. He had previously identified Fernando as the shooter from a photographic six pack.

Holman's car was hit multiple times. Watson told Holman she had been hit, and Holman drove away. Watson died from a bullet wound to the heart. The shooting was captured on a security camera video, and the videorecording was shown to the jury.

Ivan Matthews testified he knew appellants, as his girlfriend was a friend of Freddy's girlfriend. He identified Fernando and Freddy at trial. He testified that

3

appellants were members of the "Playboys" gang, and were known by their monikers of "Panic" (Fernando) and "Stranger" (Freddy).

On July 27, 2010, Matthews was at 53rd Street and Broadway waiting for his friends, who were members of the Broadway gang. Matthews testified that the area was Broadway gang territory. The territories of the Playboys gang, which is primarily Hispanic, and the Broadway gang, which is primarily an African-American gang, bordered each other.

Matthews noticed a white van making a right turn onto Broadway. Matthews saw Fernando stick his head out the passenger window of the van, and give him a "look" that made Matthews think Fernando had recognized him. Matthews testified he had seen the same van a few days before. At that time, appellants had yelled at Matthews from the van in a confrontational manner.

Two weeks earlier, Matthews had been in a fight with Fernando and Freddy, after Matthews stated "I don't bang just Playboys." Later that same day, when Matthews was with friends, Fernando and Freddy drove by in a black truck. They fired two or three shots in the air, and yelled "Playboys." That night, Freddy repeatedly drove by Matthews's home and shouted racial epithets in Spanish.

Matthews testified that on July 27th, about five to six minutes after first seeing the white van, he saw it again. The van made a right turn onto 53rd Street from Broadway, and Matthews heard 12 or 13 shots coming from the direction of Broadway. Matthews then saw the van turn onto 53rd, and heard more shots. He saw Fernando shooting from the passenger window. He saw that Freddy was driving the white van, and he could see a Playboy gang tattoo on Freddy's neck. Fernando continued shooting as the van made the turn and passed Matthews. Some Broadway gang members shot back at the van.

4

After learning of Watson's death, Matthews called the police on September 29, 2010. Los Angeles Police Department (LAPD) Detective Julio Benavides took Matthews to the police station to be interviewed. On the way, Matthews told the police Fernando and Freddy were responsible. At the station, he identified appellants and the white van from photos shown to him by the police. Matthews told the police that when they found the van, it would have bullet holes in it. At trial, Matthews testified he was 100 percent certain Freddy and Fernando were in the van.

After the interview, Detective Benavides went to Cesar Gomez's home, which also was Fernando's residence. He found a baseball cap with a Playboy pin on it on the dashboard of the white van. On the van's seat, Benavides found a nine-millimeter handgun loaded with 11 live rounds of ammunition.

Gomez testified he spoke with Detectives Benavides and Arnega on September 29, 2010. He testified that appellants were his wife's brothers, and that he had heard Fernando called by the moniker "Panic." He knew appellants were affiliated with the "Playboys" gang. Gomez had seen Fernando with a gun once or twice before.

Gomez owned a white van. He testified that he would often let Fernando borrow his van. Around July or August 2010, Gomez had noticed some holes in the van. The van did not have holes in it when he purchased it. Fernando had put caulking and tape over the holes. Gomez asked Fernando about the holes, and Fernando replied, "shots were fired at us." Gomez also testified he found a bullet inside the van near the dashboard.

An LAPD forensics examiner determined that the shell casings from the crime scene were fired from the handgun found in Gomez's van. She also matched three of four bullet fragments from the shooting scene and two fragments removed

5

from Ms. Watson's body to the handgun. Detective Benavides, who testified as the prosecution gang expert, opined that the shooting and murder in this case were for the benefit of the Playboys gang.

Appellants did not testify. The joint defense called two witnesses. Melissa Carlo, an investigator working for Fernando's defense counsel, testified she interviewed Matthews. Matthews told her he did not recognize Freddy the first time the van passed by. William Tobin, a forensic metallurgist, opined that the match between bullet fragments and the gun found in Gomez's van was not reliable. The determination of a match was based upon the questionable notion that firearms of the same type generate firing characteristics unique to that specific firearm. Tobin testified he was aware of many examples of firearm misidentification.

## DISCUSSION

On appeal, appellants contend the trial court abused its discretion and committed reversible error by failing to conduct a hearing into a juror's misconduct. Fernando contends a prosecution witness committed prejudicial misconduct by referring to a prior arrest. Freddy contends the trial court erred by failing to clarify that an aider and abettor can be guilty of a lesser crime than the perpetrator. Finally, appellants contend a 10-year gang enhancement should be stricken. We address each issue in turn.[3]

---

[3] Appellants join in each other's arguments on appeal. We conclude, however, that the arguments about the prosecution witness's alleged misconduct and the allegedly erroneous aiding and abetting jury instructions are limited to Fernando and Freddy, respectively.

I.      Juror Misconduct

        A.      Factual Background

Before opening statements and presentation of evidence, the prosecutor brought to the court's attention an issue regarding a juror. The prosecutor, Ms. Knight, described the incident:

"As I was getting off the elevator this morning, this man [Juror No. 5] approached me and I did not immediately recognize him as a juror, and he was wearing sunglasses . . . . [A]s he was passing by[,] [he] said 'Ms. Knight'[,] said 'Good Morning' and then he said 'You look very nice today' and I just said 'Thank you,' and I still did not realize at that point he was a juror. . . . [T]hen he said something to the effect of [']And I know we're not suppose to be talking, and I wanted to say good morning['] and then I realized that he was one of our jurors. So that was it, and I just sort of said thank you and walked away."

The trial judge then stated:

"All right. So I mean if this is the one I'm thinking of, he's been quite smiling . . . throughout jury selection and is one of the more upbeat jurors, and obviously I would remind the jurors they're not even so much try to have any conversation with counsel or any officer or anybody they think is a witness. . . . [I]s there anything else you want to say about number 5?"

Defense counsel for appellants requested that the juror be excused for misconduct. The judge denied the request, stating:

"I will note for the record that the jur[or] appears to be [a] Hispanic male[] and defense made an issue [of] having enough Hispanic males on the jury, and I don't think that rises to the level of misconduct and I don't think the defense [has] demonstrated a misconduct to require this jur[or] to be discharged and I'll deny the motion to discharge."

7

At no time did defense counsel ask the court to conduct a hearing or interview the juror.

B. Analysis

Appellants contend the trial court abused its discretion in failing to conduct a hearing to inquire about the juror's potential bias. We disagree.

"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct rests within the sound discretion of the trial court. [Citation.] A hearing is required only where '"the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case."' [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 878, italics omitted.) Here, there was no "good cause" to doubt the juror's ability to perform his duties or to justify his removal from the case. His comments did not suggest he could not perform his duties as a juror. Rather, the comments were nonprejudicial, and any misconduct was of a trifling nature.

*People v. Stewart* (2004) 33 Cal.4th 425 is instructive. There, the testimony of a female witness was interrupted by a break for lunch. While in the restroom, a female juror commented to her, "'"We're not supposed to have any contact but I just wanted to tell you that you're a very beautiful lady."'" The defendant moved for a new trial based upon juror misconduct, which the trial court denied. The Supreme Court affirmed, concluding the juror misconduct was of a "'trifling'" nature. (*Id.* at pp. 509, 510.) It also found the interaction was not "'inherently or substantially likely to have influenced the juror.'" (*Id.* at p. 511.) Here, the juror made similarly trifling comments prior to the start of opening statements or witness testimony.

8

Appellants suggest the juror's comments indicated he could be biased against defendants, because he might be romantically attracted to the prosecutor. Aside from the speculative nature of this argument, a juror's attraction to an interested person is not, by itself, sufficient to render the juror misconduct prejudicial. *People v. Miranda* (1987) 44 Cal.3d 57 (*Miranda*) is directly on point. There, a male juror had two out-of-court conversations with the defendant's girlfriend while the trial was ongoing. The juror admitted that he found the woman attractive, and that he had spoken with her about "going out" after the case ended. After the jury returned its penalty verdict, the defendant moved for a new trial based upon the juror's misconduct. The trial court denied the motion, although it noted the juror had "some kind of a romantic attachment" to the young woman. The Supreme Court affirmed, as the misconduct was of a "trifling nature" and nonprejudicial. The court found that substantial evidence showed the juror appeared to have separated his responsibilities as a juror from his desire to "'go out with'" the woman. (*Id*. at pp. 115-118.) Here, the facts showed a much lesser degree of misconduct than that at issue in *Miranda*. There is no indication the juror had a romantic attachment to the prosecutor, or that he wanted to go out with her after the case ended. Nor is there evidence of any subsequent similar conduct by the juror. Finally, there is no reason to infer the juror would not follow the court's future instructions. On this record, the trial court did not abuse its discretion in declining to conduct an inquiry before denying the motion to excuse the juror for misconduct.

II.     Prosecution Witness's Misconduct

        A.  Factual Background

In response to the prosecutor's question, Detective Benavides testified he was familiar with appellants. The following colloquy then occurred:

"Q: With regard to Fernando Ambriz, do you believe that he is a Playboys gang member?"

"A: Yes."

"Q: How do you know?"

"A: I arrested Mr. Ambriz in 2006 in the area of --"

Fernando's defense counsel interrupted and objected. The trial judge sustained the objection, stating, "I'm going to order that answer stricken." Defense counsel then requested that the witness be admonished. The trial judge did so, stating, "Detective, we're not talking about any other arrests of anybody." The detective complied.

Later that day, during a recess, defense counsel moved for a mistrial based upon the detective's comments. She stated:

"I believe he knew very well the contents of the court's ruling as to the 402, that the arrest and the nine-millimeter [handgun] were not [to] be mentioned during the course of his testimony, yet he basically completely flaunted the court's ruling and started off immediately with the fact that the context of his contact was my client's arrest."

The trial judge disagreed. She stated:

"I'm going to respectfully deny that motion. . . . I do not think he was flaunting my ruling. I think he just slipped. Officers don't normally say I had an interaction with somebody or I contacted somebody, they say I arrested him.

"First of all, he didn't say what it was for. I immediately stopped him and you immediately objected. I mean, I could order the jurors again to disregard it, but I'm somewhat concerned about calling additional attention to it. I told him right in front of them that he's not to discuss that, so I'm going to respectfully deny the motion."

10

At the beginning of trial, the court had instructed the jury that: "If I order testimony stricken from the record, you must disregard it and you must not consider that testimony for any purpose."

B.     Analysis

A motion for mistrial should be granted only when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Ayala* (2000) 23 Cal.4th 225, 282.) For example, "[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) "A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith. [Citations.] It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.'" (*People v. Allen* (1978) 77 Cal.App.3d 924, 934-935 (*Allen*), quoting *People v. Seiterle* (1963) 59 Cal.2d 703, 710; see also *People v. Bennett* (2009) 45 Cal.4th 577, 595 ["We assume the jury followed the admonition and that prejudice was therefore avoided."].)

Fernando contends the detective's statement could not be cured by the admonition here, as the statement suggested that Fernando had a prior criminal history. While exposing a jury to a defendant's prior criminal history may prejudice a defendant's case (*People v. Price* (1991) 1 Cal.4th 324, 431), the brief mention that a defendant had been arrested without any further details is distinct from the intentional admission of evidence that defendant is an ex-convict (*People v. Ozuna* (1963) 213 Cal.App.2d 338, 339-341) or that he was on parole (*Allen*,

11

*supra*, 77 Cal.App.3d at pp. 934-935).  An arrest does not imply that the defendant was convicted of a crime.  *People v. Bolden* (2002) 29 Cal.4th 515 (*Bolden*) is instructive.  There, the prosecutor asked a police officer about the defendant's address.  The officer answered:  "'It was at the Department of Corrections parole office located at--,'" before he was interrupted by the prosecutor.  (*Id*. at p. 554.)  Later that day, the defense moved for a mistrial, arguing that the officer's reference to a parole office was prejudicial to the defendant because it implied that the defendant had at least one prior felony conviction for which he had served a term in state prison.  The trial court denied the motion.  The Supreme Court found no error, and no denial of due process.  The court concluded:  "It is doubtful that any reasonable juror would infer from the fleeting reference to a parole office that defendant had served a prison term for a prior felony conviction.  The incident was not significant in the context of the entire guilt trial, and the trial court did not abuse its discretion in ruling that defendant's chances of receiving a fair trial had not been irreparably damaged."  (*Bolden*, *supra*, 29 Cal.4th at p. 555.)  Similarly, here, it is doubtful that any reasonable juror would infer from the brief reference to an arrest that Fernando had been convicted of any crime, much less a felony.  Likewise, the singular mention of the prior arrest was not significant in the context of the trial, which revolved around the identifications by Holman and Matthews.

Moreover, any error was harmless.  (See *People v. Garcia* (1984) 160 Cal.App.3d 82, 93, fn. 12 ["[I]n cases where jurors are improperly exposed to certain factual matters, the error is usually tested under the standard set out in *People v. Watson* (1956) 46 Cal.2d 818, 836."].)  Here, two eyewitnesses identified Fernando as the shooter, both from photographic six packs and in court.  Fernando often used a white van, which Matthews identified as the van involved in the shooting.  The van had recently been riddled with bullets, consistent with

Matthews's eyewitness account that some Broadway gang members had returned fire during the shooting. Bullet casings at the scene were matched to the gun found in the van. Under these circumstances, it is not reasonably probable that Fernando would have obtained a more favorable result had the incidental remark about his prior arrest not been made. (Cf. *People v. Harris* (1994) 22 Cal.App.4th 1575, 1580-1582 [in light of overwhelming evidence of guilt, no reversible error where witness mentioned appellant's parole status].)

III. Jury Instruction on Accomplice Liability

A. Factual Background

Before instructing the jury, the trial court asked defense counsel whether there were objections to the proposed instructions. Counsel had none. Nor did either counsel propose any clarifying or amplifying instructions.

The trial court then gave a series of instructions on the criminal liability of a perpetrator (Fernando) and an aider and abettor (Freddy). The judge gave CALCRIM No. 521, which instructs the jury that a defendant may be found guilty of first degree murder under two theories: (1) the murder was willful, deliberate and premeditated, and (2) the murder was committed by shooting a firearm from a motor vehicle. The judge also instructed the jury with CALCRIM No. 562, which states that if a defendant intended to kill one person, but by mistake or accident killed someone else, the crime, if any, would be the same as if the intended person had been killed.

The judge then instructed with the recently revised CALCRIM No. 400, which provides:

> "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime, I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.

13

"A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

"Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."[4]

To define aiding and abetting, the judge instructed the jury with CALCRIM No. 401, which provides:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1.  The perpetrator committed the crime;

"2.  The defendant knew that the perpetrator intended to commit the crime;

"3.  Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4.  The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"[¶] . . . [¶]

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a

---

[4]     CALCRIM No. 400 was revised in 2010, to remove language stating that an aider and abettor is "equally guilty" as a perpetrator.

14

person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor." (Italics omitted.)
"

The trial court told the jury that the prosecution had another theory of aiding and abetting liability. The court then instructed the jury with CALCRIM No. 403, on the natural and probable consequences theory of aiding and abetting, as follows:

"Before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault with a firearm. To prove that the defendant is guilty of murder, the People must prove that: (1), the defendant is guilty of assault with a firearm; (2), during the commission of assault with a firearm[,] a co-participant in that assault with a firearm committed the crime of murder; and (3), under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the assault with a firearm. A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the assault with a firearm, then the commission of murder was not a natural and probable consequence of assault with a firearm. To decide whether crime of assault with a firearm was committed, please refer to the separate instruction that I will give you on that crime."

Finally, the court explained to the jury the verdict forms it would review:

"You will be given verdict forms for guilty and not guilty of first-degree murder and second-degree murder. You may consider these different kinds of homicide in whatever order you wish . . . ."

The jury convicted both appellants of first degree murder.

B.    Analysis

Freddy contends the trial court erred by giving incomplete instructions on accomplice liability. As an initial matter, we conclude he has forfeited any claim

15

of instructional error. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. [Citation.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) Moreover, "the trial court ha[s] no duty to instruct sua sponte on the full spectrum of offenses conceivably committed by [the defendant]." (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1592 (*Woods*).) As noted, defense counsel neither objected to the jury instructions nor requested clarifying or amplifying instructions.

Freddy argues there was no forfeiture. He contends that the jury instructions were incomplete as a matter of law, because the prosecutor suggested in voir dire that an aider and abettor was "equally guilty" as a perpetrator. We disagree. Even when CALCRIM No. 400 contained the "equally guilty" language, courts held that the instruction was "generally correct in all but the most exceptional circumstances." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165; see also *People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [referring to CALJIC No. 3.00, which has similar "'equally guilty'" language].) Moreover, the prosecutor merely asked the prospective juror whether the juror thought it fair that an aider and abettor was considered as guilty as a perpetrator. No objection was raised to this question, and thus any claim of error was forfeited. (Cf. *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [defendant forfeited claim that prosecutor committed misconduct by misstating the law by failing to object or to seek a curative admonition below].) Finally, the jury was instructed that the attorneys' statements were not the law. The court stated: "You must follow the law as I explain it to you even if you disagree with it. If you believe that the attorneys['] comments on the law conflict with my instructions, you must follow my instructions." On this record, Freddy has forfeited any claim of instructional error.

Even were we to find no forfeiture, we would conclude there was no reversible error. Freddy contends the trial court erred because it gave the jury "a series of instructions that likely led the jury to believe that if . . . Fernando was guilty of first degree murder, then appellant, as an aider and abettor, necessarily was guilty of the same degree of murder." We disagree. First, the revised CALCRIM No. 400 does not state that Freddy was "equally guilty" as Fernando. Moreover, the jury was instructed that it could consider second degree murder in any order it wished. No reasonable jury could have understood from the instructions that if it found Fernando guilty of first degree murder, it must necessarily find Freddy guilty of first degree murder.

Freddy next contends he could be guilty only of second degree murder, as the trial judge failed to specifically connect CALCRIM No. 403 -- the instruction on aiding and abetting liability as a natural and probable consequence of the crime of assault with a firearm -- with first degree murder, as opposed to murder generally. He relies on *Woods*.

In *Woods*, *supra*, 8 Cal.App.4th 1570, the defendant and a companion, armed with guns, set out to find a rival gang member to retaliate for a prior shooting. The men entered the apartment of two acquaintances of the target, but did not find him. After assaulting the acquaintances, they left. As they were leaving, they saw two people getting into a car. The companion fired into the car, killing one occupant and injuring the other. (*Id*. at p. 1577.) At trial, the prosecutor's theory was that the defendant was guilty of first degree murder, because (1) his companion was guilty of first degree murder, and (2) first degree murder was a natural and probable consequence of the assault with firearms on the two acquaintances. (*Id*. at p. 1579.) During deliberations, the jury asked the court: "'Can a defendant be found guilty of aiding and abetting a murder in the second

17

degree if the actual perpetrator of the same murder is determined to be guilty of murder in the first degree?'" The trial court answered, "No," and the jury convicted the defendant of first degree murder. (*Ibid*.) The appellate court reversed, stating that, "in determining aider and abettor liability for crimes of the perpetrator beyond the act originally contemplated, the jury must be permitted to consider uncharged, necessarily included offenses where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was such a consequence. Otherwise, . . . the jury would be given an unwarranted, all-or-nothing choice for aider and abettor liability." (*Id*. at p. 1588.) The court concluded that the evidence raised a question whether the first degree murder was a reasonably foreseeable consequence of the armed assaults of the two acquaintances, but "established beyond question" that the necessarily included offense of second degree murder was a reasonably foreseeable consequence. (*Id*. at p. 1578.) Thus, the court conditionally reduced the murder conviction to second degree. (*Id*. at p. 1596.)

*Woods* is distinguishable. First, no evidence suggests the jury here was confused or thought that it could not convict Freddy of second degree murder if it found Fernando guilty of first degree murder.[5] More important, under the specific circumstances of this case, the only reasonably foreseeable murder of which Freddy could be found guilty was murder in the first degree. In finding Freddy guilty as an aider and abettor, the jury necessarily found that Fernando's intentional killing was a natural and probable consequence of the assault with a firearm. As the intentional killing of Watson was committed from a motor vehicle, the murder was of the first degree as a matter of law. (See § 189 ["[A]ny murder

---

[5] As noted, the jury was given individual verdict forms for both first and second degree murder for each defendant.

18

which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree."].)  In short, this is not a case "where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was . . . ." (*Woods*, *supra*, 8 Cal.App.4th at p. 1588.)

Moreover and independently, there was no evidence that Freddy intended to aid Fernando in any other type of assault.  Indeed, defense counsel did not argue that Freddy was guilty of a lesser included offense, such as second degree murder.  Rather, the defense presented at trial was that Freddy was not the driver, the witness identifications were unreliable, and the ballistics evidence was flawed.  As the Supreme Court recently stated with respect to former CALCRIM No. 400: "Here, however, neither defendant asserts a defense theory or points to extenuating circumstances that might have led the jury to find that one defendant's individual culpability was less than that of the other defendant, nor does the evidence at trial suggest any such defense or circumstances. . . .  Under the circumstances, there is no reasonable likelihood that the jury was confused or misled by the trial court's instruction that the aider and abettor and the direct perpetrator were 'equally guilty.'" (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 44.)  Similarly, it is mere speculation that the jury would have been confused or misled by the trial court's instruction on the natural and probable consequence theory of accomplice liability.

IV.    Gang Enhancements

Freddy contends the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C), which was imposed and stayed, should be stricken.  Rather, a 15-year minimum parole eligibility term under section 186.22, subdivision (b)(5)

19

should be imposed instead.  Fernando joins in the argument.  The People concede the sentencing error.

In *People v. Lopez* (2005) 34 Cal.4th 1002, the Supreme Court held that "a gang-related first degree murder, which is punishable by a term of 25 years to life" is not subject to the additional 10-year enhancement under section 186.22, subdivision (b)(1)(C).  Rather, it is subject to a 15-year minimum parole eligibility term under section 186.22, subdivision (b)(5).  (*Id.* at p. 1004.)  Section 186.22, subdivision (b)(5) states in pertinent part:  "[A]ny person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."  Thus, with respect to Fernando, the trial court should have imposed a minimum 15-year parole eligibility enhancement pursuant to section 186.22, subdivision (b)(5).  With respect to Freddy, however, no enhancement under section 186.22, subdivision (b) may be imposed, as the court already imposed a firearm use enhancement under section 12022.53, subdivision (e)(1).  (See *People v. Brookfield* (2009) 47 Cal.4th 583, 590 [when another principal in the offense uses or discharges a firearm but the defendant does not, the defendant is subject only to the greater of the applicable sentencing enhancements under section 186.22, subdivision (b) or section 12022.53, subdivision (e)(1)].)  Accordingly, we remand to the superior court to strike the section 186.22, subdivision (b)(1)(C) enhancements in both abstracts of judgment, and to impose a 15-year minimum parole eligibility enhancement in Fernando's case.  As modified, the sentences are affirmed.

**DISPOSITION**

The matter is remanded for further proceedings consistent with this opinion. The clerk of the superior court shall forward corrected abstracts of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, J.

We concur:

EPSTEIN, P. J.

SUZUKAWA, J.

21